UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------
UNITED STATES OF AMERICA,

          -against-

JAMES FELTON, *et al.*,

          Defendants.
------------------------------------------------

17cr21

OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

        Defendant James Felton moves to suppress physical evidence seized following his arrest, as well as various post-arrest statements. For the following reasons, Felton's motions to suppress physical evidence are denied, and his motion to suppress post-arrest statements is granted.

## BACKGROUND

### I. The Arrest and Search

        On December 23, 2016, a magistrate judge issued an arrest warrant for Felton and two accomplices related to an alleged narcotics conspiracy and the accompanying use and possession of firearms. (Decl. of Lloyd Epstein, ECF No. 278 ("Epstein Decl.") ¶ 8 & Ex. A.) The alleged accomplices were Felton's son and nephew—both of whom were at large. (Epstein Decl. ¶¶ 8, 16; Aug. 8, 2018 Oral Arg. Tr. ("Tr."), at 25:6–9.) After obtaining the arrest warrant, police traced Felton's cell phone to an apartment in the Bronx and went there to make an arrest. (Epstein Decl. ¶ 9.) The accomplices' locations were unknown. Felton answered the door and was arrested at the threshold of the apartment. At the time of the arrest, police did not have a search warrant. (Epstein Decl. ¶ 12.)

        After arresting Felton, detectives conducted a search of the small, one-bedroom

apartment. The main door to the apartment opened into a narrow hallway, which led directly into the living room. The kitchen was to the right of the entrance. Three doors lined the left side of the hallway—one for the bathroom, another for a closet, and one for the bedroom. All three doors were in direct view of the entryway. (Mem. of Law of the United States of America in Opp'n to Defs.' Mots. to Suppress and for Other Relief, ECF No. 287 ("Opp'n"), Ex. 1 (photograph depicting layout of apartment).) Detectives began the search by entering the kitchen, bathroom, and living room, and looking in the closet. Detectives noticed a futon in the living room. (Tr. at 32:6–8.) Photographs reveal that multiple toothbrushes were in the bathroom. (Gov't Ex. 123.) However, police did not find anyone else in the apartment. (Epstein Decl. ¶ 15.)

The search culminated in Felton's bedroom. Detectives searched under Felton's bed and in the corners of the room. They also checked the bedroom closet, where Detective Pedro Gomez observed the handle of a firearm protruding from under a gym bag on the closet shelf. (Epstein Decl. ¶ 13; Tr. at 34:15–35:9.) However, detectives did <u>not</u> seize the gun at that time and instead sought a warrant. The warrant application included a five-page affidavit sworn to by a detective with eight years' experience who was not present for the arrest. That affidavit included information about the investigation of Felton, including allegations that Felton committed a murder in furtherance of a narcotics conspiracy, and information regarding the detective's experience and training, which taught him that "perpetrators of drug- and gang-related violence, including shootings, often store evidence of those crimes in the places where they reside in the days and weeks after a shooting." (Epstein Decl. Ex. A at 7.) While the application mentioned that detectives observed a firearm in the apartment, it explicitly asked that any finding of probable cause not be based on that observation. (Epstein Decl. Ex. A at 7 n.1.)

The warrant was approved by the presiding magistrate and the firearm was seized when the warrant was executed. (Epstein Decl. Ex. A at 3.[1])

At the time of the arrest, detectives also observed cell phones. While it is unclear whether the observation was made during the initial search or during a trip back into the apartment to get warmer clothes for Felton, detectives spotted the cell phones on the living room futon. When asked, Felton told the detectives that he owned the cell phones. (Tr. at 54:23–55:1.) Thereafter, the detectives placed the phones into Felton's pockets while he was handcuffed, and later seized and vouchered them at the precinct. (Tr. at 55:3–7, 76:18–77:1.)

Felton seeks to suppress both the firearm and the cell phones. He contends that the protective sweep was invalid because police had no reasonable belief that anyone else was in the apartment and they do not assert specific and articulable facts validating a sweep of his bedroom. The Government counters that (1) detectives were permissibly in the apartment conducting a valid protective sweep and observed the evidence in plain view; (2) the evidence would have inevitably been discovered because of the valid warrant; and (3) even if the searches violated the Fourth Amendment, they were conducted in good faith and suppression is not warranted. Felton counters that the inevitable discovery doctrine does not apply because the search warrant was unreasonably duplicative of the arrest warrant and relied on the observation of the firearm.

II. The Post-Arrest Statements

After the arrest, police transported Felton to an interrogation room and two detectives advised Felton of his Miranda rights. (Epstein Decl. ¶ 21.) The ensuing interrogation

---

[1] Any citations to Ex. A to the Epstein Declaration refer to the ECF page number.

was videotaped.  (Epstein Decl. Ex. B.[2])  Once in the interrogation room, Detective 1 asked, "Now that I have advised you of your rights, are you willing to answer questions?"  (Epstein Decl. ¶ 22.)  Felton unequivocally responded, "No."  (Epstein Decl. ¶ 22.)  Detective 2 then left the room, leaving Felton alone with Detective 1, at which point the two stared at each other silently.  (Epstein Decl. ¶ 23.)  Shortly thereafter, Detective 1 left Felton alone in the room while Felton attempted to nap, save for three brief visits from detectives to give him water and a cigarette.  (Epstein Decl. ¶¶ 23–24.)  About one hour after the invocation of his right to remain silent—and now after 2:00 a.m.—the same two detectives re-entered the same room and asked Felton biographical questions.  (Epstein Decl. ¶ 24.)  When asked about employment, Felton answered that he worked in construction.  (Epstein Decl. ¶ 24.)  After these "pedigree" questions, Detective 2 re-read Felton his Miranda rights and asked Felton if he would be willing to answer questions.  (Epstein Decl. ¶ 25.)  While the video quality is lacking, it appears that Felton said "[n]o."  (Epstein Decl. ¶ 25.)  In immediate response, Detective 1 said "[j]ust think about it before . . ." and Detective 2 said "[y]ou can stop at any time, you can answer the questions you want to answer, but I can't ask you anything else."  (Epstein Decl. ¶ 26.)  At that point, Felton said "[a]lright" and made incriminating statements.  (Epstein Decl. ¶¶ 26–27.)

Felton seeks to suppress the entire interaction, arguing that the detectives failed to "scrupulously honor" his unambiguously invoked Miranda rights.  He further argues that the questions regarding his employment went beyond normal "pedigree" and were improper.  The Government responds that Felton failed to unambiguously invoke his right to remain silent and merely refused to waive the right.  They further argue that the questions regarding Felton's employment constituted proper "pedigree" questions.

---

[2] The transcript provided in the Epstein Declaration matches the video in sum and substance for purposes of this Opinion & Order.

DISCUSSION

I.  The Firearm

Because the firearm was not seized during the protective sweep, the threshold question is whether the search warrant—under which the firearm was seized—was valid. Felton argues that the search warrant was based on the observation of the firearm during an invalid protective sweep, which renders the search warrant invalid. But the search warrant application specifically stated that any finding of probable cause should not be based on the observation of the firearm. (Epstein Decl. Ex. A at 7 n.1.) And, firearm observation aside, there was ample probable cause that the suspect of a murder and narcotics conspiracy could have been harboring contraband in his apartment, as found by the magistrate. Compare United States v. Kwok-Ching Yu, 1991 WL 222093, at *4 (S.D.N.Y. Oct. 18, 1991) ("[A]n experienced agent's expert opinion that drug dealers are likely to keep evidence of drug transactions in their homes, taken together with evidence of the defendant's involvement in a narcotics conspiracy, is sufficient to establish probable cause for a search warrant [for defendant's apartment].") and United States v. Mikhailin, 2013 WL 4399046, at *2 (S.D.N.Y. Aug. 14, 2013) (holding that a law enforcement agent's opinion, based on training and experience, is an important factor to be considered in making a probable cause determination), with Epstein Decl. Ex. A. Further, "a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate." Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007); see also United States v. Leon, 468 U.S. 897, 914 (1984).

In addition, despite Felton's contentions, it would not have been problematic if the search warrant and arrest warrant relied on similar information. See Walczyk, 496 F.3d at 148, 161 (holding that an arrest and search were not unlawful, even though the arrest warrant and

5

search warrant applications "used the same information"). And Felton's contention is also wrong on the facts because the search warrant application includes sworn statements premised on a detective's knowledge and experience that did not appear in the arrest warrant application. (Epstein Decl. Ex. A.)

Moreover, even if the magistrate considered the observation of the firearm in her finding of probable cause, the seizure would still be valid if detectives found the firearm in plain view while conducting a constitutionally valid protective sweep. See United States v. Kirk Tang Yuk, 885 F.3d 57, 79 (2d Cir. 2018) ("During a protective sweep, officers are entitled to seize items that are in plain view if they have probable cause to suspect that the item is connected with criminal activity." (quotation marks omitted)). As evidenced by the photographs and Detective Gomez's testimony, the firearm was in plain view on the shelf. (Opp'n Ex. 2; Tr. at 34:15–35:9.) Therefore, the remaining question is whether the sweep was valid.

There are two types of protective sweeps: (1) sweeps requiring no probable cause or reasonable suspicion, in which officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched"; and (2) sweeps requiring "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 334 (1990). In addition, officers may conduct a security sweep inside a home after an arrest is made just outside the home "if the arresting officers had '(1) a reasonable belief that third persons [were] inside, and (2) a reasonable belief that the third persons [were] aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers

or the public.'" United States v. Oguns, 921 F.2d 442, 446 (2d Cir. 1990) (quoting United States v. Vasquez, 638 F.2d 507, 531 (2d Cir. 1980)).

The protective sweep in question was valid under all three of these frameworks. First, the bedroom closet was a place "immediately adjoining the place of arrest from which an attack could be immediately launched." Buie, 494 U.S. at 334. "Whether a given area constitutes a 'room' for search purposes . . . depends not on a static measurement but on the manner in which a space is configured." Kirk Tang Yuk, 885 F.3d at 79. Here, the bedroom of a small New York City apartment opened directly into a hallway which was steps away from the entryway where Felton was arrested. In Kirk Tang Yuk, the Second Circuit held that a similar security sweep of a master bedroom "immediately adjoin[ing] the room where [defendant] was arrested" did not violate the Fourth Amendment. Kirk Tang Yuk, 885 F.3d at 78–79 (quotation marks omitted). There, "on the far side of the living room, opposite the entrance to the master bedroom, [wa]s the vinyl-floored entrance hallway, where [defendant] was arrested. [Defendant] argue[d] that [the Court] should not consider the bedroom as immediately adjoining the hallway because the distance between the two areas is greater than the 'span of one room.' . . . Because the entrance 'hallway' and the living room in the residence at issue formed a single, undivided space, anyone who exited the master bedroom into the living room would have been in the same undivided open space as the 'hallway.'" Kirk Tang Yuk, 885 F.3d at 79. Moreover, in United States v. Lauter, the Second Circuit affirmed a district court's finding that a "back room" was "immediately adjoining" the area in which defendant was arrested, and noted that the scope of the protective sweep was constitutional "particularly in light of the small size of the apartment." 57 F.3d 212, 216–17 (2d Cir. 1995). So too, here.

But even if the bedroom were not immediately adjoining the place of arrest, the

7

Government presented specific and articulable facts that someone might have been there who could have launched an attack, regardless of whether the arrest took place inside or outside of the apartment. The arrest warrant named Felton and two co-conspirators, both of whom were familial relations and at large. Further, Felton had been out of state, suggesting that the apartment might have been someone else's. And the affidavit in support of the search warrant described violent crimes—namely, murder and narcotics conspiracy involving firearms. Finally, the small apartment contained a futon in the living room and multiple toothbrushes in the bathroom, suggesting that several individuals may have been sharing the space. In sum, it would have been dangerous for detectives <u>not</u> to conduct a security sweep of the bedroom and adjoining closet.

Ultimately, the detectives did what the law requires them to do. After observing a firearm, they went and got a warrant. This was entirely appropriate and does not create grounds to suppress the firearm. <u>See</u> <u>United States v. Ventresca</u>, 380 U.S. 102, 108 (1965) ("A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."). Therefore, the motion to suppress the firearm is denied.

II. <u>The Cell Phones</u>

Felton supplemented his motion to suppress during oral argument to add a motion to suppress recovered cell phones. (Tr. at 54:5–7, 76:10–17.) While the alleged procedure of putting cell phones into Felton's pocket gives this Court pause, the cell phones were lawfully seized under the plain view and inevitable discovery doctrines.

First, and for the same reasons discussed above, detectives were constitutionally permitted in the living room—be it during a protective sweep or to escort Felton into the

apartment to put on clothing. Further, detectives had probable cause to suspect that an alleged member of a narcotics conspiracy's cell phone may contain information related to Felton's alleged criminal activity—such as address books—and they were observed in plain view. Thus, the cell phones were lawfully seized. See Kirk Tang Yuk, 885 F.3d at 79 ("During a protective sweep, officers are entitled to seize items that are in plain view if they have probable cause to suspect that the item is connected with criminal activity." (quotation marks omitted)).

Second, the cell phones would have inevitably been discovered. "Under the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006) (quoting Nix v. Williams, 467 U.S. 431, 447 (1984)). "In essence, the inevitable discovery doctrine's application turns on a central question: Would the disputed evidence inevitably have been found through legal means 'but for' the constitutional violation?" Heath, 455 F.3d at 55. Here, the answer is yes. As discussed above, this Court finds that the search warrant was constitutionally valid. That warrant included cell phones in its list of evidence to be searched. (Epstein Decl. Ex. A at 10.) Given that the cell phones were sitting on a futon in the middle of the living room, officers inevitably would have discovered them. Therefore, the motion to suppress the cell phones is denied.

III. Post-Arrest Statements

"Statements obtained in violation of Miranda are of course subject to a prophylactic rule of exclusion." United States v. Gonzalez, 764 F.3d 159, 165 (2d Cir. 2014). And "[o]nce Miranda rights have been invoked, interrogation must stop and the invocation must be 'scrupulously honored.'" Gonzalez, 764 F.3d at 165.

Thus, the first question "is whether the defendant 'unambiguously' invoked his Miranda rights." United States v. Plugh, 648 F.3d 118, 124 (2d Cir. 2011). While courts do not specifically define what it means to "unambiguously invoke[]" rights, it is clear that a defendant does not invoke where he "did not say that he wanted to remain silent or that he did not want to talk with the police." Berghuis v. Thompkins, 560 U.S. 370, 382 (2010) (quotation marks omitted). Accordingly, if Felton "made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning." Berghuis, 560 U.S. at 382. He did. When asked if he would answer the detectives' questions on two separate occasions, Felton twice said no. That constitutes an invocation of his right to remain silent. See United States v. Guzman, 724 F. Supp. 2d 434, 446 (S.D.N.Y. 2010) (suppressing post-Miranda statement because officers did not "scrupulously honor" the right to remain silent where defendant "indicated that he was not willing to speak with the officers" by "answering 'no'" to the Miranda form's question regarding whether he would speak with officers).

Therefore, the question is whether the detectives "scrupulously honored" Felton's right to remain silent. "Whether . . . the right to silence was 'scrupulously honored' depends on factors such as the length of time between questioning and questioning on a different subject matter than the original interrogation." Saunders v. Lavalley, 2014 WL 2624763, at *14 (S.D.N.Y. June 10, 2014) (adopting report and recommendation). Further, once the right is invoked, "fresh questioning cannot resume unless there is a reasonable basis for inferring that the suspect has voluntarily changed his mind." United States v. Ortiz, 943 F. Supp. 2d 447, 460 (S.D.N.Y. 2013) (quotation marks omitted). Here, after the first invocation, the same detectives came back to the same room one hour later to rehash "pedigree" questions and to re-initiate the same interrogation at 2:00 a.m. Between the time of the first invocation and the detectives'

10

return, Felton napped. There was no indication he had changed his mind about whether to remain silent. Then, when Felton invoked his right a second time, the detectives successfully attempted to overbear his will to remain silent. (Epstein Decl. ¶ 26.) Simply put, they did not "scrupulously honor" his right to remain silent.

And for similar reasons, Felton's responses to the "pedigree" questions—asked only one hour after he invoked his right—are also excluded. While it is well established that "pedigree" questions do not implicate Miranda, they are only considered "pedigree" questions if they are "reasonably related to police administrative concerns." Rosa v. McCray, 396 F.3d 210, 222 (2d Cir. 2005). Such an inquiry is in accord with the purpose of the pedigree exception: to allow law enforcement "to secure the biographical data necessary to complete booking or pretrial services." Pennsylvania v. Muniz, 496 U.S. 582, 602 (1990) (quotation marks omitted).

Accordingly, "[t]o determine whether questioning falls within the pedigree exception, courts examine the circumstances to determine whether the police inquiries are those 'normally attendant to arrest and custody,' or whether they are instead questions that the police should know are reasonably likely to elicit an incriminating response from the suspect. Inquiries falling into the second category do not qualify for the pedigree exception." Scott v. Strack, 164 F.3d 619, at *2 (2d Cir. Apr. 6, 1998) (summary order) (quoting Muniz, 496 U.S. at 600). Here, the detectives' questions do not qualify for the pedigree exception.

The detectives already knew the answers to Felton's pedigree questions. (Tr. at 25:10–16, 69:4–7; Epstein Decl. Ex. B.) Indeed, when detectives asked Felton for his phone number, he indicated that he had provided it to officers while being booked. (Epstein Decl. Ex. B.) Therefore, the questions were not asked "to secure the biographical data necessary to complete booking or pretrial services." Muniz, 496 U.S. at 602 (quotation marks omitted). Nor

were they "normally attendant to arrest and custody." Scott, 164 F.3d 619 at *2. Rather, they were pretextual and intended to establish a rapport with Felton so that detectives could elicit an incriminating response. See Rosa, 396 F.3d at 222 (explaining that the objective inquiry regarding pedigree questions is whether "the police should have known that asking the pedigree questions would elicit incriminating information"). Therefore, the responses made to pedigree questions asked immediately before the second set of Miranda warnings are also suppressed.

## CONCLUSION

For the foregoing reasons, Felton's motions to suppress physical evidence are denied, and his motion to suppress post-arrest statements is granted. The Clerk of Court is directed to terminate the motion pending at ECF No. 278.

Dated: September 18, 2018
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.